# IN THE COURT OF APPEALS OF IOWA

No. 23-1680
Filed July 23, 2025

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**LOREN ARTHUR WILSON,**
    Defendant-Appellant.
_____

    Appeal from the Iowa District Court for Sac County, Christopher C. Polking, Judge.

    A criminal defendant appeals from his conviction and sentence for second-degree sexual abuse and lascivious acts with a child.  **AFFIRMED.**

    Elena Greenberg of Greenberg Law, PLLC, Des Moines, for appellant.

    Brenna Bird, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.

    Considered without oral argument by Greer, P.J., Badding, J., and Carr, S.J.*

    *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**CARR, Senior Judge.**

Loren Wilson appeals from his conviction and sentence for second-degree sexual abuse and lascivious acts with a child. Wilson argues the district court erred in not reopening the record to allow him to testify and in denying him a new trial and that there is insufficient evidence to convict him of the charged crimes. We affirm.

## I.     Background Facts and Proceedings

Wilson attended the 2022 Christmas Day celebration of his girlfriend's family at their home in Sac City. His girlfriend's two younger sisters lived at the home and were also in attendance. Later in the day, Wilson befriended the ten-year-old sister—the victim in this case—playing with her and her toys. They played late into the evening. Later in the evening, everyone else in the home went to bed, and Wilson continued to play loudly with the child. Wilson's girlfriend eventually came into the room that he and the child were in and told them to quiet down. Wilson said he would "be down in a few," so his girlfriend went back downstairs and began texting him "alluring or provocative" pictures to which he did not respond. Wilson then joined the child in her bedroom upstairs.

The child got ready for bed, turned off the light, and got into her bed under the covers. Wilson also got into the bed and drank a couple beers while watching YouTube videos with the child on his phone. Wilson asked the child if she wanted to cuddle to which she "said yes." Wilson's girlfriend continued to text him multiple times to come down to the downstairs bedroom with her so they could have sex. Wilson again did not respond.

Meanwhile, Wilson, who was sitting next to the child in bed, requested to kiss the child on the lips, pulled her over "close to him," proceeded to kiss her on the lips, and then pulled her even closer, which made the child "uncomfortable and confused." Then he asked the child if he could tell her a secret and "made a weird noise in [her] ear." Wilson grabbed the child's hand and "put it on his privates," which caused the child to "scream and [fling her] hand away."

The child testified that after she screamed, Wilson "turned over real quick and then turned back over and asked what happened." The child said she "had a nightmare." Wilson responded that "[she] must have been sleeping." The child testified she could not have been sleeping because "[she] never woke up from anything and [she] didn't sleep. . . . And [she] never had a nightmare that would even be close to that." The child then observed that "the zipper on [Wilson's] pants [was] down." The child then asked Wilson to retrieve her "anxiety ring" that she used sometimes to calm down and left the room to wash her hands because "[she] had the ick, and because [she] felt skin, and [she] kn[e]w that's not a good thing."

The child, then "terrified," "[s]haking," "hyperventilating," and with "[a] look in her eyes [her mother will] never get out of her head," woke her mother up to report what had happened. Her mother tried to lay her down and cuddle her but the child jumped up and said "I can't. I can't." The child's mother took her downstairs and went out to smoke while the child was with her father, who was now also awake. When the mother came back in, she and the child returned to the mother's room, where the child told her what had happened. After leaving that room, the mother "made eye contact" with the father and said Wilson "needs to get out," causing the father "to bolt from the couch." Fearing the father's reaction, the

mother then called law enforcement to the premises. Sac County police officers and sheriff's deputies responded to the scene and found Wilson in the basement. Wilson denied the child's story and claimed he was "lost," but admitted he was in bed with her and claimed she awoke from a nightmare screaming.

On December 26, a criminal complaint was filed against Wilson. On January 4, 2023, he was formally charged by trial information with second-degree sexual abuse under Iowa Code section 709.1 and .3(1)(b) (2022) and lascivious acts with a child under Iowa Code section 709.8(1)(b) and .8(2)(a). Following jury trial, the jury returned a verdict finding Wilson guilty on both counts on August 25. Wilson moved for new trial and in arrest of judgment, and the district court denied both motions in full. Wilson was sentenced to an indeterminate term of incarceration not to exceed twenty-five years on count one with a mandatory minimum of seventy percent and an indeterminate term of incarceration not to exceed ten years on count two. Wilson was also sentenced to a special sentence under to Iowa Code section 903B.1; was ordered to pay a surcharge, victim restitution, and civil penalty; was ordered to register on the sex offender registry; and was found to be subject to additional statutory restrictions.

Wilson now appeals.

## II.    Standard of Review

We review a district court's refusal to reopen the record for abuse of discretion. *State v. Long*, 814 N.W.2d 572, 575–76 (Iowa 2012). Denials of motions for new trial are also reviewed for abuse of discretion. *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016). The district court's decision to deny a request to reopen the record "will ordinarily not be interfered with by a reviewing court." *Id.*

We review challenges to sufficiency of the evidence for correction of legal error. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012).

## III. Discussion

### A. Reopening the Record

Wilson argues the district court abused its discretion in not reopening the record to allow him to testify after he previously waived his right to testify, and on that basis, also abused its discretion in not granting him a new trial.

A court must consider the *Teeters* factors when deciding whether to reopen the record for the introduction of new evidence:

> (1) the reason for the failure to introduce the evidence; (2) the surprise or unfair prejudice inuring to the opponent that might be caused by introducing the evidence; (3) the diligence used by the proponent to secure the evidence in a timely fashion; (4) the admissibility and materiality of the evidence; (5) the stage of the trial when the motion is made; (6) the time and effort expended upon the trial; and (7) the inconvenience reopening the case would cause to the proceeding.

*Long*, 814 N.W.2d at 578 (quoting *State v. Teeters*, 487 N.W.2d 346, 348 (Iowa 1992)). We consider whether the district court's discretion on these factors "was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* at 576 (citation omitted).

At trial, after the State rested its case and after Wilson's motion for directed verdict was overruled, the court engaged him in a very complete colloquy on his decision not to testify:

> THE COURT: So, Mr. Wilson, I need to ask you a few questions about that. So you have two rights here that are exact opposites. You have the absolute right to testify in this matter if you want to. You also have the absolute right to remain silent and not testify in this matter. If you don't want to.

The decision whether to testify or not testify is yours and yours alone. You obviously should make that decision in my mind under the advice of your counsel.

Without telling me anything that the two of you have discussed in detail, have you had opportunity to discuss the issue of whether you want to testify with your counsel?

WILSON: Yes.

THE COURT: Have you had adequate time to do that?

WILSON: Yes, Your Honor.

THE COURT: And after receiving that advice of counsel and thinking about the matter, what is your decision as to whether to testify or not testify in this matter?

WILSON: I choose to not testify, Your Honor.

THE COURT: All right. Do you want an instruction to the jury that they should not take any inference from the fact that he's elected not to testify?

DEFENSE COUNSEL: Yes, Your Honor.

The defense then rested and jury instructions were given to the jury. Notably, the jury was instructed via standard uniform instruction that Wilson did not testify and that it must draw no adverse conclusions from that decision. On the next day, Wilson changed his mind and requested that the district court reopen the record to allow him to testify. The district court refused to reopen the record, stating:

Mr. Wilson, the state rested their case yesterday. At that point I had what's called a colloquy with you, a conversation with you regarding your right to testify or not testify.

The decision was up to you. But that was the time you needed to make your decision. I asked you what your decision was, and you stated it was not to testify. At that point the defendant rested. The state had rested. The defendant had rested. The evidentiary record was closed.

The jury has already received their instructions of law, and those instructions of law included an instruction requested by you that they were not to take anything from the fact that you had decided not to testify.

There's a phrase that's often used by the appellate courts in regards to the motion—motions for summary judgment in civil cases which is that in civil cases it's the put up or shut up moment of the case.

When you said you didn't want to testify and the defense rests, your put up or shut up moment was over. It's gone. So you cannot testify. That time is passed. We'll now proceed on to closing arguments.

In its well-reasoned ruling on Wilson's motions in arrest of judgment and for new trial, the district court considered the factors outlined in *Teeters*. The strongest consideration was given to the first factor—the sole reason for Wilson's failure to testify was that he "had a change of heart."

The district court ran through an extensive colloquy with Wilson during which Wilson confirmed that he had an opportunity to consult with his counsel on whether to testify, had adequate time to do so, had made the express decision not testify while understanding his right to do so, and that he wished an instruction be given to the jury directing them not take any inference from the fact that Wilson elected not to testify. As the court later found, "It was therefore in no way through accident, inadvertence or mistake that he had not testified in the normal order of trial when the record was open." The district court noted that every reason Wilson gave for wanting to reopen the record—trial not going as expected, two character witnesses not testifying, disagreements with his trial counsel over the motion in limine, information that could have been cleared up by his testimony—all existed at the time he expressly chose to not testify.

Additionally, prejudice would have occurred to the State, which would have been forced to either delay trial for rebuttal witnesses or "forgo any chance at rebuttal." We also consider that giving the defendant the very last word on the evidence, even after the jury instructions, would risk giving it too much weight by the jury. And diligence was not used to secure Wilson's testimony. The district

court pointed out that Wilson "had nine months to prepare for trial" and "was on the third day of trial before he finally needed to make his decision whether to testify." He "was aware of all the ways in which he now says the trial had not 'gone his way,' and after colloquy [Wilson] elected not to testify." Wilson "did not make a record at trial of what he expected to elicit from his own testimony" and how such testimony would be admissible and relevant. Further, the jury heard from Wilson in the statements he made to police on the night of the abuse. And as the district court observed, Wilson's indication that he wanted to emphasize his "deep and serious relationship with his girlfriend" would have made it all the more confusing as to why he chose to cuddle with a ten-year-old child rather than going to bed with his adult girlfriend who wished to have sex with him.

> His cross at the hearing showed that while he could have denied the inappropriate touching, he would have had to admit that he was in the same bed as a ten-year-old girl, late at night, that he had been drinking, was anticipating sexual activity with his girlfriend, that he and the victim were lying next to each other, and that the victim suddenly became startled and scared, and yelled in his ear.

Lastly, the jury instructions would have needed to be rewritten and redelivered to the jury, which would have likely introduced confusion. The district court also recognized that the court was "stretched thin" and would have to rely on the chance that a senior judge was available to cover court business on the following Monday if reopening the record caused an extension of the trial. And the jury would have been asked to serve longer than their predicted three-day service week.

All the *Teeters* factors weigh against granting Wilson's request to reopen the record, and the district court did not abuse its discretion in denying Wilson's

request to do so.  Likewise, we cannot say that the district court abused its discretion in denying Wilson a new trial on the same grounds.  In his motion for new trial, Wilson contends he "should have the opportunity to testify before the jury."  Under Iowa Rule of Criminal Procedure 2.24(2)(b), the district court may grant new trial "[w]hen from any other cause the defendant has not received a fair and impartial trial."  But Wilson received a fair and impartial trial.  As we have extensively analyzed above, Wilson carefully considered and then expressly waived his right to testify.  He cannot now un-ring that bell.

## B. Sufficiency of the Evidence

Wilson lastly argues that there is insufficient evidence to convict him of the charged crimes.

To convict Wilson of second-degree sexual abuse, the State was required to prove beyond a reasonable doubt that:

> 1. On or about December 26, 2022, [Wilson] performed a sex act with [the child].
> 2. [Wilson] performed the sex act while [the child] was under the age of 14 years.

"Sex act" was defined as "any sexual contact between the finger or hand of one person and the genitals or anus of another person."

To convict Wilson of lascivious acts with a child, the State was required to prove beyond a reasonable doubt that:

> 1. On or about December 26, 2022, [Wilson] with or without [the child]'s consent, permitted or caused [the child] to fondle or touch [Wilson]'s genitals or pubes;
> 2. [Wilson] did so with the specific intent to arouse or satisfy the sexual desires of [Wilson] or [the child].
> 3. [Wilson] was then 16 years of age or older.
> 4. [The child] was then under the age of 14 years.

It is undisputed that the child was under fourteen years old and that Wilson was at least sixteen years old. From a combination of the child's, girlfriend's, and mother's testimony, we know that Wilson had followed the ten-year-old child into bed, stayed in bed with the child after his girlfriend repeatedly asked him to come to bed and have sex with her, asked to kiss the child on the lips, pulled her close to him, grabbed her hand and put it on his privates, had his pants zipper down, gave the child the "ick," and caused the child a severe traumatic response that disturbed her mother.

Wilson points to the child's statements that she "thought it was a dream" and referred to the incident as a "nightmare." But the jury was free to credit or discredit the child as a witness. The jury chose to credit the witness—her retelling of the events was consistent despite being told by Wilson her experience was a dream. And the surrounding circumstances could support a reasonable factfinder's conclusion that the child's story was true. Wilson did not respond to his girlfriend's texts to come to bed despite being on his phone watching YouTube with the child. Wilson admitted to an officer that he followed the child to bed.

And the jury was instructed that they "should consider the facts and circumstances surrounding the act to determine the defendant's specific intent." They were further instructed that they "may, but are not required to, conclude a person intends the natural results of his acts." The jury could reasonably conclude the intended natural result of a grown man asking a child to kiss him on the lips and using her hand to touch his "privates" while his pants were unzipped was to

satisfy his specific intent to arouse his or the child's sexual desires.  Consequently,

Wilson's sufficiency challenge fails.  We affirm.

**AFFIRMED.**